**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JOHN SOLAK, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| MEAD JOHNSON NUTRITION COMPANY, STEVEN M. ALTSCHULER, HOWARD B. BERNICK, KIMBERLY A. CASIANO, ANNA C. CATALANO, CELESTE A. CLARK, JAMES M. CORN ELIUS, STEPHEN W. GOLSBY, MICHAEL GROBSTEIN, PETER KASPER JAKOBSEN, PETER G. RATCLIFFE, MICHAEL SHERMAN, ELLIOTT SIGAL, ROBERT S. SINGER, RECKITT BENCKISER GROUP PLC, and MARIGOLD MERGER SUB, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) ) ) | |

## <u>COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934</u>

Plaintiff John Solak ("Plaintiff"), by his attorneys, brings the following Verified Class Action Complaint ("Complaint") on his own behalf and on behalf all stockholders of Mead Johnson Nutrition Company ("Mead Johnson" or the "Company"), other than Defendants (as defined below) and their affiliates, against Mead Johnson's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and the rules and regulations promulgated thereunder, including Rule 14a-9, in connection with the Schedule 14A Preliminary Proxy Statement filed with the Securities Exchange Commission on March 13, 2017 ("Proxy Statement") concerning the pending cash-for-stock merger (the "Proposed Transaction") with Reckitt Benckiser Group plc ("Reckitt"). The allegations in this Complaint are based upon Plaintiff's personal knowledge

as to himself, and upon information and belief and investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      On February 10, 2017, Mead Johnson and Reckitt jointly announced that the companies entered into a definitive agreement (the "Merger Agreement") to merge into a single company that would have an equity value of $16.6 billion.

2.      Under the terms of the Merger Agreement, which was unanimously approved by the Boards of Directors of both companies, Mead Johnson stockholders will receive $90 in cash for each share of Mead Johnson common stock they own.

3.      The Proxy Statement filed in connection with the Proposed Transaction fails to provide stockholders with material financial information necessary to decide whether the Proposed Transaction provides appropriate consideration for the shares of common stock.

4.      The Board's conduct will cause irreparable harm to Mead Johnson stockholders for which monetary damages will not be an adequate alternative remedy.  Accordingly, Plaintiff seeks to enjoin the Proposed Transaction unless the Board complies with its duties to provide all material information necessary to make a fully informed decision on the Proposed Transaction.

## THE PARTIES

5.      Plaintiff is and was, at all times relevant hereto, a holder of shares of Mead Johnson common stock.

6.      Defendant Mead Johnson is a Delaware corporation that maintains its principal corporate offices at 2701 Patriot Blvd., Glenview, Illinois 60026.  The Company manufactures, distributes, and sells infant formula, children's nutrition, and other nutritional products in over 50 markets worldwide.  Mead Johnson common stock trades on the New York Stock Exchange under the ticker symbol "MJN."

7.      Defendant Steven M. Altschuler is and has been, at all relevant times, a member of the Board.  Alongside co-defendant Elliot Sigal, Dr. Altschuler also serves on the board of directors of Spark Therapeutics.

8.      Defendant Howard B. Bernick is and has been, at all relevant times, a member of the Board.

9.      Defendant Kimberly A. Casiano is and has been, at all relevant times, a member of the Board.

10.     Defendant Anna C. Catalano is and has been, at all relevant times, a member of the Board.  Ms. Catalano serves as the Committee Chair for the Nominating and Corporate Governance Committee.

11.     Defendant Celeste A. Clark is and has been, at all relevant times, a member of the Board.

12.     Defendant James M. Cornelius is and has been, at all relevant times, a member of the Board.  Mr. Cornelius serves as Chairman of the Board.  Mr. Cornelius has also worked for Bristol-Myers Squibb Company ("BMS") in various director and employee capacities from at least 2006 until 2015.

13.     Defendant Stephen W. Golsby is and has been, at all relevant times, a member of the Board.  Mr. Golsby previously served as the Company's President and Chief Executive Officer from 2008 until 2013 and served in various other capacities with Mead Johnson or its affiliates since at least 1997.

14.     Defendant Michael Grobstein is and has been, at all relevant times, a member of the Board.  Mr. Grobstein serves as the Chair of the Risk Management and Compliance Committee.  Mr. Grobstein also serves on the board of directors of BMS.

15.     Defendant Peter Kasper Jakobsen is and has been, at all relevant times, a member of the Board.  Mr. Jakobsen has served as the Company's President and Chief Executive Officer since April 2013, prior to which he served as the Company's executive vice president and chief operating officer from January 2012.

16.     Defendant Peter G. Ratcliffe is and has been, at all relevant times, a member of the Board.  Mr. Ratcliffe serves as Committee Chair for the Audit Committee and as a financial expert for the Committee.

17.     Defendant Michael Sherman is and has been, at all relevant times, a member of the Board.

18.     Defendant Elliot Sigal is and has been, at all relevant times, a member of the Board.  Dr. Sigal serves as the Committee Chair for the Nutrition Science and Technology Committee.  Dr. Sigal also serves on the board of directors of Spark Therapeutics with Dr. Altschuler and is deemed not an independent director due to an immediate family member being a partner at the Company's Independent Registered Accounting Firm.

19.     Defendant Robert S. Singer is and has been, at all relevant times, a member of the Board.

20.     Defendants identified in paragraphs 7 through 19 are collectively referred to herein as the "Individual Defendants" or the "Board."  By virtue of their corporate directorships, the Individual Defendants are fiduciaries of the Company as well as of Plaintiff and other Company stockholders.

21.     Each Individual Defendant herein is sued individually as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the

fact that each has engaged in all or part of the unlawful acts, plans, schemes, or transactions of which Plaintiff complains of herein.

22.     Defendant Reckitt is company registered in the United Kingdom and is a consumer health and hygiene company.  Reckitt has operations in over 60 countries, with headquarters in London, Dubai and Amsterdam, and sales in most countries across the globe.

23.     Defendant Marigold Merger Sub is a Delaware corporation and a wholly-owned, indirect subsidiary of Reckitt.  Upon completion of the Proposed Transaction, Mead Johnson will merge with Defendant Merger Sub, which will continue as the surviving limited liability company.

24.     Collectively, Mead Johnson, the Individual Defendants, and Reckitt are referred to as "Defendants" where it is appropriate to do so.

## JURISDICTION AND VENUE

25.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  17 C.F.R. § 240, 14a-9.

26.     The Court has jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Mead Johnson is incorporated within District and therefore is subject to its jurisdiction.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) the conduct at issue took place, at least in part, and had an effect in this district; (ii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary

participation in the wrongful acts detailed herein occurred in this District; and (iii) Defendants

are engaging in numerous activities that have an effect in this District.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action on his own behalf and as a class action on behalf of all

other public stockholders of Mead Johnson (except Defendants herein, and any persons, firm,

trust, corporation or other entity related to or affiliated with them and their successors in

interest), who are or will be threatened with injury arising from Defendants' wrongful actions, as

more fully described herein (the "Class").

29.     This action is properly maintainable as a class action for the following reasons:

a.      The Class is so numerous that joinder of all members is impracticable.

According to the Proxy Statement filed on March 13, 2017 there are approximately 183.6 million

shares of common stock issued and outstanding.  There are likely thousands of beneficial holders

of Mead Johnson common stock scattered throughout the world.

b.      There are questions of law and fact which are common to the Class

including, among other things, whether:

> i.      The Defendants failed to provide material information to
> stockholders in the Company's Proxy Statement;
>
> ii.     The Individual Defendants violated Section 14(a) of the Exchange
> Act and Rule 14-a-9 promulgated thereunder;
>
> iii.    The Individual Defendants violated Section 20(a) of the Exchange
> Act;
>
> iv.     Plaintiff and the other members of the Class would suffer
> irreparable injury were the Proposed Transaction consummated.

c.      Plaintiff is committed to prosecuting this action and has retained

competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the

claims of the other members of the Class and Plaintiff has the same interests as the other

members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

        d.      The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

### Background of Mead Johnson

30.      Mead Johnson is a global leader in pediatric nutrition, with a product portfolio that addresses a broad range of nutritional needs for infants, children, and expectant and breastfeeding mothers.  The Company operates in Asia, North America, Latin America, and Europe, and achieved $4.1 billion in global net sales in 2015.

31.      In 2009, Mead Johnson split-off from Bristol Meyers Squib, conducting an IPO in February 2009 and became a fully independent company after it completed the split-off in December 2009.  Since 2009, the Company has consistently posted solid financial results and an ability to sustainably grow stockholder value.  The Company was able substantially increase its December 2009 market capitalization of $8.8 billion to a market capitalization of $12.98 billion by the end of 2016.

32.      In the months leading to the Merger Agreement, Mead Johnson was positioning itself for continued sustained growth.  The Company implemented a three-year program in the Fourth Quarter of 2015 targeting reductions in the Company's non-advertising expenses with an

emphasis on generating productivity and improving operational efficiencies, which the Company called the "Fuel for Growth" program.

33.     Initially, the Company projected Fuel for Growth to reduce operating expenses by as much as $120 million, with a targeted reduction of $60 million in 2016 alone.  After only two fiscal quarters of implementation, the Company revised its projections for annual savings by $60 million, increasing the savings to $180 million, an additional 50% of initially projected savings.

34.     The Company presented its Fuel for Growth program in three stages to investors, with a transition stage ending in the middle of 2017, a gradual build of momentum into 2018, and a drive to profitable growth thereafter.  While the above reduction in expenses was intrinsic to the Transition stage, another essential element is the Company's investment in its product portfolio and sales channels in China.

35.     The focus on sales channels and products within China will position the Company in a rapidly expanding market well into the future as due to the country's latest policy changes, most significantly the phasing out of the long-standing one-child policy.

36.     The transition and positioning in China was touted by the Company's CEO in the Fourth Quarter and Full Year 2016 Earnings Announcement:

> In the fourth quarter we continued to make progress with a series of important strategic transitions in key markets.  Our imported products again grew strongly in China - and we doubled our sales volume via e-commerce out of Hong Kong over the prior quarter.  Though it will take some time for us to complete the transition phase we are currently in, we are encouraged by early signs our plans are working.

37.     Within that same announcement, the Company noted that it had achieved a $90 million reduction of operating expenses in 2016 alone, and a cumulative savings of $110 from the initiation of the Fuel for Growth program in the Fourth Quarter of 2015.  Although the CEO

noted that the Company's transition was set to continue through 2017, he noted that the transition would finish in 2017 "with performance strengthening through the second half of the year."

38.     As noted on the earnings call following the announcement, one of those drivers for 2017 was the Company's winning of the California Women, Infants, and Children ("WIC") program contract, the biggest in the United States representing 13% of the babies in the $6 billion-a-year federal program which provides vouchers to pregnant and postpartum women.

39.     Indeed, CEO Jakobsen noted in the earnings call, "In 2015 we began to execute a new strategic roadmap.  This roadmap provides a blueprint against which we measure ourselves. It forms the foundation of growth we'll begin to see in the second half of 2017, and more pronouncedly from 2018 onwards."

***The Proposed Transaction***

40.     On February 10, 2017, the Proposed Transaction was announced over the newswires:

**Mead Johnson Nutrition Agrees to Be Acquired by Reckitt Benckiser**

**Deal Creates New Opportunities for Expansion, Growth**

GLENVIEW, Ill.--(BUSINESS WIRE)--Feb. 10, 2017-- Mead Johnson Nutrition Company (NYSE:MJN) today announced that it has reached an agreement to be acquired by Reckitt Benckiser Group plc (RB), the world's leading consumer health and hygiene company. As a result of this transaction, Mead Johnson will become a new division of RB with its globally-recognized Enfamil and Nutramigen brands joining RB's portfolio of leading consumer health brands.

RB has agreed to pay $90 cash for each share of Mead Johnson common stock in a transaction valued at approximately $17.9 billion (including net debt). The price represents a premium of 29% to MJN's undisturbed closing price on February 1, 2017 before market speculation of a potential transaction. Including Mead Johnson's net debt of $1.2 billion as of December 31, 2016, the total enterprise value of the transaction is $17.9 billion, representing a multiple of 17.4x 2016 non-GAAP EBITDA. The transaction has been unanimously approved by the Mead Johnson Board of Directors. Closing of the transaction is subject to customary conditions, including approval by shareholders of both Mead Johnson and RB and regulatory approvals, and is expected to occur during the third quarter

of 2017. Mead Johnson will continue to pay its normal quarterly dividend until closing.

"This transaction recognizes the value of our leading brands and strong, global organization," said Kasper Jakobsen, MJN's Chief Executive Officer. "As part of Reckitt Benckiser, a bigger health care focused business recognized for its marketing capabilities, we will derive benefits from both increased scale and diversification. We are pleased that our shareholders have an opportunity to recognize significant and immediate value and are excited for the new opportunities for our employees as part of a larger company."

"Mead Johnson's geographic footprint significantly strengthens our position in developing markets, which account for approximately 40% of the combined group's sales, with China becoming our second largest 'Powermarket,'" noted RB's Chief Executive Officer, Rakesh Kapoor. "We are confident that our deep understanding of consumer needs and our expertise in scaling global brands will deliver significant growth for the MJN portfolio. We will draw on the best of both businesses and continue to build on Mead Johnson's extensive R&D, regulatory, quality and specialist distribution capabilities."

Goldman Sachs acted as Mead Johnson's lead financial advisor. Morgan Stanley also acted as financial advisor to the company. Kirkland & Ellis LLP acted as Mead Johnson's legal advisor.

41.     In addition to the lead financial advisors, Bank of America Merrill Lynch International ("BOA"), Deutsche Bank AG, and HSBC Bank Plc agreed to provide Reckitt with $20,000,000,000 in debt financing for the Proposed Transaction.

***The Preclusive Deal Protection Devices***

42.     Unfortunately for Plaintiff and the other Class members, the terms of the Merger Agreement are calculated to unreasonably dissuade other potential bidders from making competing offers.  The Merger Agreement contains deal protection devices that when considered individually; substantially increase the likelihood that the Proposed Transaction will be consummated.  However, when examined collectively, these protection measures render the Proposed Transaction a *fait accompli* and will leave Mead Johnson stockholders with inadequate consideration for their shares.

43.     For example, the Merger Agreement, section 6.03, in a "No Solicitation" clause prohibits the Company and its subsidiaries, directors, officers, employees, and agents from engaging in any communications of any kind that could lead to a competing proposal with respect to the Merger.  This includes the cessation of any existing talks with competing bidders and to enforce any existing confidentiality and standstill agreements the Company has in place.

44.     Additionally, Section 6.03(c) and 6.03(d) requires the Company to notify Reckitt of any competing proposals within 24 hours of receipt and allow Reckitt the ability to match the competing proposal.   Finally, Section 10.03 of the Merger Agreement provides for a $480 million termination fee payable by the Company.

45.     These terms virtually foreclose the possibility that a bidder would assume the significant time and expense required in order to engage in the sales process.

**The Proxy Statement Is Materially Deficient And Misleading**

46.     Stockholders must receive complete and accurate and information about the Proposed Transaction prior to deciding whether to vote in favor or against the Proposed Transaction.  Accordingly, the Individual Defendants have a duty under Sections 14(a) and 20(a) of the Exchange Act to disclose all material information regarding the Proposed Transaction to Mead Johnson stockholders.

47.     However, the Proxy Statement issued on March 13, 2017 fails to provide Company stockholders with necessary and material information to assess the Proposed Transaction with respect to (1) Management's Projections; and (2) the data and inputs underlying the financial valuations in the so-called "fairness opinions" of the Company's financial advisors in connection with the Proposed Transaction, Goldman Sachs & Co. ("Goldman Sachs") and Morgan Stanley & Co. LLC ("Morgan Stanley") (collectively, the "Financial Advisors").

### *Management Projections*

48.     The Proxy Statement discloses that the Financial Advisors and the Board relied on Mead Johnson's management's projections (the "Management Projections") in assessing the fairness of the Proposed Transaction to Mead Johnson stockholders.  However, the Management Projections on page 45 of the Proxy Statement is missing the following information: (1) a reconciliation of GAAP EBIT to non-GAAP unlevered free cash flows; (2) projections of expected dividend; (3) projections of expected stock-based compensation; (4) projections of net earnings attributable stockholders in the aggregate; and (5) synergies and expected costs of implementing synergies.  Furthermore, in footnote 5 of the table on Page 45 of the Proxy Statement, an explanation is needed as to why dividends and undistributed earnings are deducted from the adjusted earnings per share.

49.     Because the Financial Advisors relied on these projections in performing their financial analyses and rendering their fairness opinions, the omission of this information renders the entire fairness opinion of each financial advisor in the Proxy Statement false and/or materially misleading.

50.     Further, these statements in the Proxy Statement are rendered false and/or misleading by the omissions identified above as this information is integral to stockholders' evaluation of the consideration being offered in the Proposed Transaction.  These financial projections provide a sneak peek into Mead Johnson expected future performance (i.e., growth/profitability) and, consequently, its value as a standalone entity.  More importantly, these analyses will reflect the realization of the Fuel for Growth initiative that was financed over the last few quarters.  Indeed, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders, as it comes from members of corporate

management who have their fingers on the pulse of the Company.  Accordingly, it is no surprise that financial projections are among the most highly sought-after disclosures by stockholders in the context of corporate transactions such as this.

### *Financial Advisors "Fairness Opinions"*

51.     The Proxy Statement also fails to fully and fairly disclose certain material information concerning the financial analyses conducted by Goldman Sachs and Morgan Stanley that purport to support their fairness opinions.

52.     For example, Goldman Sachs' Historical Stock Analysis on page 50 of the Proxy Statement fails to provide a valuation summary detailing the calculation of Mead Johnson's fully diluted shares, equity value (at the unaffected price and the offer) and enterprise value (at the unaffected price and the offer).

53.     Goldman Sachs' Selected Company Analysis on page 51 of the Proxy Statement fails to provide the objective selection criteria for the companies and fails to provide how the stock-based compensation of these companies was treated in the provided EBITDA multiples.

54.     Further, Goldman Sachs' Discounted Cash Flow Analysis on page 52 of the Proxy Statement fails to identify the assumptions underlying the estimate of Mead Johnson WACC, as well as the implied terminal pricing multiples corresponding to the assumed perpetuity growth rates.

55.     Goldman Sachs' Selected Transaction Analysis on Page 52 of the Proxy Statement fails to disclose the objective selection criteria and display the observed transaction-by-transaction enterprise values and financial metrics. Importantly, the analysis fails to explain the apparent inconsistency between using (apparently unadjusted) EBITDA to calculate transaction multiples, while applying selected multiples to Mead Johnson's adjusted EBITDA.

56.     Morgan Stanley's analysis starting on Page 56 of the Proxy Statement similarly fails to (1) provide a valuation summary detailing the calculation of Mead Johnson's fully diluted shares, equity value (at the unaffected price and the offer) and enterprise value (at the unaffected price and the offer) in the Historical Trading Range analysis; (2) identify the assumptions underlying the estimate of Mead Johnson's cost of equity in the Price Target Analysis; (3) disclose objective selection criteria and display the observed company-by-company financial metrics examined in the Selected Comparable Trading Analysis; (4) disclose objective selection criteria and display the observed transaction-by-transaction enterprise values and financial metrics in the Selected Precedent Transaction Analysis; and (5) disclose the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples and explain the use of forward pricing multiples to calculate terminal value in the Discounted Cash Flow Analysis.

57.     These statements in the Proxy Statement are rendered false and/or misleading by the omissions identified above because such omissions are essential to the stockholders' ability to properly evaluate the analysis performed by Goldman Sachs and Morgan Stanley.  Without the aforementioned information, stockholders ability to understand Mead Johnson's analysis is significantly limited, rendering them unable to make a fully-informed decision whether to vote for or against the Proposed Transaction.

## FIRST CAUSE OF ACTION

**For Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against the Individual Defendants and Mead Johnson)**

58.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

59.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of

the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

60.     During the relevant period, the Individual Defendants disseminated the false and

misleading Proxy Statement specified above, which failed to disclose material facts necessary in

order to make the statements made, in light of the circumstances under which they were made,

not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated

thereunder.  Mead Johnson is liable as the issuer of these statements.

61.     By virtue of their positions within the Company, the Individual Defendants were

aware of this information and of their duty to disclose this information in the Proxy Statement.

The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.

The Proxy Statement misrepresented and/or omitted material facts, including material

information about the unfair sale process for the Company, the unfair consideration offered in

the Proposed Transaction, and the actual intrinsic value of the Company's assets.   The

Defendants were at least negligent in filing the Proxy Statement with these materially false and

misleading statements.  The Defendants have also failed to correct the Proxy Statement and the

failure to update and correct false statements is also a violation of Section 14(a) of the Exchange

Act and Rule 14a-9 promulgated thereunder.

62.     The omissions and false and misleading statements in the Proxy Statement are

material in that a reasonable stockholder would consider them important in deciding how to vote

on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

63.    By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 is what you will you just promulgated thereunder.

64.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

65.    Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## SECOND CAUSE OF ACTION

### For Violations of 20(a) of the Exchange Act
### (Against All Defendants)

66.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67.    The Individual Defendants acted as controlling persons of Mead Johnson within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Mead Johnson and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

16

68.     Each of the Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each of the Individual Defendants is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

70.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions that had input from the Individual Defendants.

71.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands injunctive relief in their favor of the Class and against Defendants as follows:

a)      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class representative;

b)      Enjoining Defendants, their agents, counsel employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the

Company disseminates a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

c)     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

d)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and granting such other and further equitable relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 27, 2017

**RIGRODSKY & LONG, P.A.**

By:  */s/ Brian D. Long*

Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Gina M. Serra (#5387)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

**OF COUNSEL:**

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Gregory M. Nespole
Kevin G. Cooper
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600
Fax: (212) 545-4653

*Attorneys for Plaintiff*